DORÉ, Judge.
These two cases, arising out of the same accident, were consolidated for trial in the lower court and consolidated in this court on appeal. The accident occurred on the night of October 7, 1949, in Beauregard Parish, at a point some -one and one-half or two miles north of the community of Longville, on U. S. Highway 171. One of the plaintiffs, Rev. George I. Jones, a Baptist minister, had left his home near De-Ridder early on the morning of October 7th and had .driven to New Orleans in order to pick up Albert G. Palmer, a minister of another faith, and Palmer’s small daughter who was that day being discharged from .Charity Hospital. The girl was in a cast from her chest almost to her feet. She was placed on the rear seat of the car, a 1949 Pontiac .sedan, while the two men rode on the front seat. They left the hospital between 2:45 and 3 :00 P.M., and had an uneventful return trip up to the time of the accident, which occurred at about 8:45 P.M. They made three short stops, once to get soft drinks, once to get ice cream for the child, ánd once to wipe off the windshield. By the time they had readied Opelousas the weather had become cloudy and light rain had begun to fall, necessitating the use of windshield wipers for the rest of the trip. From Hollings-worth the parties travelled practically due north along Highway 171 for approximately nine or ten miles, to where the accident occurred. The terrain there is slightly rolling, with no big or steep hills. Rev. Jones testified that just prior to the collision he had been driving about fifty miles an hour; that it had been raining off and on, and his windshield wipers were working; and that his headlights were on bright. Immediately prior to the accident he admits having seen what appeared to be a shadow on the road, on an incline that he was beginning to ascend. His testimony is that he then removed his foot from the accelerator, but before he could identify *324 the “shadow” as a vehicle in his path it was too late to either stop or go around the vehicle, and consequently his car and the vehicle collided.
What plaintiffs collided with was a dual wheel trailer bearing an air compressor and Ford motor, pulled by a 1942 model Chevrolet Army truck. This unit and a 1939 International truck immediately ahead of it, on which wás mounted a rotary drilling rig, were owned by C. B. Sollay, A. A. Sollay,' doing business as Sollay Brothers’ Water Well Service, who, along with their insurer, Travelers Indemnity Company, and David H. Burke and Chester Blanchard, the drivers of the two ■ motor units, are made defendants herein. ■ The International truck ánd mounted rig had a gross weight of some 17,000 pounds; the Chevrolet and attached trailer unit had a gross weight o'f 14,000 pounds.' These units, accompanied by C. B. Sollay, who was driving his car, had left Ged, Louisiana, between 4 :30 and 5:00 P.M. and were on the way to' a new well location approximately four miles north of Longville and off some distance from the paved road.
In the Jones suit, it is alleged in Articles 14 arid‘15 that:
“Petitioner further shows that .both of said trucks and the trailer thereto attached were painted Blue-Gray and -their color blended with the night, preventing petitioner from seeing said trucks and trailer in time.
“Petitioner further shows that the elevation of said highway immediately, prior to the point of the accident is not level, but that your petitioner had driven down a. long hill slope to the bottom of a natural water drain or branch and the highway, while straight, rises on a hill slope, on the opposite side of said water drain, and immediately when the level of your petitioner’s headlights picked up and illuminated the hill slope, going up, that he was suddenly confronted with the truck and trailer, parked upon said highway and in his lane of traffic.”
.The plaintiffs made several allegations of negligence, the chief of which were that defendants were negligent in blocking the eastern or right lane of the highway with the two trucks and trailer; that the trucks and trailer were stopped on the highway without any taillights or clearance lights burning or visible and without any flares or other warnings being put out to give notice of their presence.
Defendants filed an exception of no cause of action in the suit brought by plaintiff Jones. There is in the record a statement in.the minutes of October 16, 1950 stating that “The exception of no cause or right of action is hereby overruled” in the case brought by plaintiff Palmer; this was apparently meant to apply to the exception filed in the Jones case. At any rate, the cases were consolidated and tried together, after answers were filed. Motors Insurance Corporation intervened in the Jones suit, claiming that intervenor was entitled to $1,760.49 out of what Jones might recover' on the ground that the com-pány had his car insured and paid his loss up'to that amount.
The defense to the Jones suit was that the accident resulted solely'from negligence of the plaintiff in driving at an excessive and unlawful rate of speed, in not maintaining a proper lookout, and in failing to have his car under proper control; contributory negligence was pleaded in the alternative. By way of defense to the Palmer suit defendants alleged that the accident was caused by Jones’ negligence which was imputed to Palmer for the reason that they were engaged in a joint venture, and in the alternative, for the reason that Jones was the agent of Palmer; and in the further alternative it was alleged that Palmer was contributorily negligent in the following among other respects:
“In riding in the vehicle being driven by G. J. Jones at a grossly excessive and unlawful rate of speed.
“In riding in the vehicle being then driven by G. J. Jones at a grossly, excessive and unlawful rate of speed under the adverse weather and road conditions then existing at the time and place of the accident.
“In carelessly and negligently failing to maintain a proper lookout for his own and the safety of others while permitting himself to be driven at a reckless and unlawful rate of speed.
*325 “In riding in the vehicle driven by G. Jones and being then operated in a; grossly ¡negligent manner and at an excessive rate of .speed under the adverse weather and road conditions existing, and without the vehicle being under proper control of the driver, all to his certain knowledge.
“In riding and continuing to ride in the vehicle being negligently operated in the manner above set forth in (a), (b), (c), and (d) without protest.”
After hearing the • evidence the lower court, in very brief written reasons, concluded that after the truck driven by Burke had broken down, the truck and trailer operated by Blanchard came to a stop on the right-hand side of the highway and the accident occurred within four or five minutes afterward; and that Blanchard was negligent in not placing flares on the highway as required by law.. The trial judge further concluded that plaintiff Jones was negligent in driving his car at the rate of fifty miles per hour and in not keeping a proper lookout for vehicles ahead of him; and the demands of Jones were rejected at his costs. The Court found that Palmer was a guest in the Jones car, that he did not have an opportunity to warn Jones of the danger, and that he was not guilty of negligence. Palmer was awarded $1,000.-00 for pain and suffering, $5,000.00 for his injuries, $750.00 for loss of wages, and $613.00 for medical expenses, or a total award of $7,363.00, the judgment being in solido against all of the defendants.
Jones has appealed from the judgment rejecting his demands. Defendants appealed suspensively from the judgment against them in the Palmer suit, and Palmer answered the appeal asking that the award be increased to the amount he originally prayed for.
. Defendants argue now that the Jones case should have been disposed of on their exception of no cause of action, this position being based on the decision in Hogue v. Akin Truck Line, La.App., 16 So.2d 366; this point will be considered first. The Hogue case is very similar to the present situation and might with justification be used as the basis for maintaining defendants’' exception were it not for two more recent decisions .by our Supreme Court. In Dodge v. Bituminous Casualty Corp., 214 La. 1031, 39 So.2d 720, the court referred favorably to Gibbs v. Illinois Central R. Co., 169 La. 450, 125 So. 445, where it was held.that an exception of no cause of action based on plaintiffs’ contributory negligence should not .be maintained unless the facts alleged-by the plaintiff show affirmatively that he was guilty of negligence and that such negligence was the proximate .cause of the accident. The court went on to say that “A decision on the exception of no cause of action is not a fair way to determine the rights of litigants, since the facts alleged in each case raise several problems materially affecting those rights which can best be solved by. the, hearing of evidence in the case.” [214 La. 1031, 39 So.2d 722.]
And in West v. Ray, 210 La. 25, 26 So.2d 221, 224, the Supreme Court had said that “an affirmative defense, presented through exceptions or motions tried or triable only on the face of the petition, should not be sustained unless the allegations of the petition exclude every reasonable hypothesis other than the premise upon which the defense is based.”
Considering arts. 14 & 15 quoted supra, it is felt that the allegations of Jones’ petition do'not necessarily convict him of .contributory negligence, and . that the exception of no cause of action was properly overruled.
Much of the testimony in this case is conflicting and cannot be reconciled. C. B. Sollay, one of the owners of the trucks involved, D. H. Burke, the driver of the lead truck (International), and Chester Blanchard, driver of the second truck, the Chevrolet with the attached trailer,: all testified substantially alike on most points. They stated that before they left the' oil field at Ged, the lights on both trucks were checked by another employee of Sollay and the headlights and taillights were all burning; that a taillight was hooked up on the trailer by making an open or uncovered connection between a light wire from the truck and a wire from the trailer, and all these lights were burning at various stages along the trip prior-to the accident; and *326 that the trailer had two clearance lights, one on each side, situated on top of the fénders about half way between the front and rear ends of the trailer. They testified that all three vehicles stopped a few minutes in DeQuincy and then stopped again in Hollingsworth, where Sollay and Burke drank coffee; that just prior to the accident Sollay overtook the two trucks; that the accident occurred one and one-half or two miles north of Longville, and at that time the International truck, driven by Burke, had pulled off onto the shoulder of the road with a broken drive shaft, Sol-lay had turned around at some point up ahead of the trucks and driven back and parked on his left facing the International truck, and that the Chevrolet truck was still in motion, moving slowly, not having yet caught up with the lead truck. They testified that the lights were burning on all three vehicles at the time Jones ran into the rear of the second truck.
According to Sollay, he passed the lead truck at the top of a hill and as he did so Burke “holloed” to him and he could tell Burke was having trouble; so he watched Burke in his rear view mirror, saw him pull off the road, and he, Sollay, found a place' to turn around and drove back to where Burke had stopped. Sollay said the two trucks were about 300 feet apart when he passed them. This question, about the distance between the two trucks, and the time element were the points on which the testimony of defendants varied most. Burke stated that Blanchard had been following about 100 feet behind him, as compared with the estimate of 300 feet given by Sollay. Blanchard also stated that he was driving about 100 feet behind Burke, while Warren Smith, the driver of a Her-rin Transportation truck who was called as a witness by plaintiffs, testified that he passed the two trucks just north of Long-ville about 8 :30 and that the trucks were then travelling about 50 to 65 feet apart. This point becomes material in trying to decide whether the second truck was still in motion or whether it was stopped at the time of the collision.
Burke testified that their caravan left Ged about 4:30 to 5:00 P.M.; Blanchard said they left about 5:00 to "5:30 and Sol-lay said they left about 5 :30 to 6 :00. Burke stated that the trucks left Hollingsworth about 8:30, while Blanchard’s testimony was that they left about 7:45. Burke stated that he checked the taillight on Blanchard’s truck and trailer in Hollingsworth, and they were burning; Blanchard himself didn’t get out of the truck at that time, but he said that his taillights were “supposed” to have been burning prior to the accident.
While Sollay testified that he passed Burke at the top of a hill and saw that he was having trouble, Burke testified that his drive shaft broke as he was going downhill and that he coasted on down that hill and partly up the next one before he came to a stop.
Roy Williams was called as a witness on behalf of defendants, his testimony obviously being designed to show that defendants’ vehicles were well lighted and that Jones could have seen them in time to avoid the accident. His testimony was that he approached from the south, shortly after the accident, and that when he was still a quarter of a mile away he noticed that something was amiss because he saw “headlights and red lights and some trucks and cars and what-have-you.” His statements about being able to see so much are in such sharp contrast to what all the other witnesses testified about the poor vision that night as to make his testimony, when coupled with his general vagueness, of no value whatsoever.
Rev. Jones testified that he first observed what appeared to be a shadow on the road ahead of him and that by the time he was able to determine that this shadow was an obstruction in the road he was too close to avoid hitting it. He testified positively that there were no lights on the rear of the trailer, and that it was not in motion. Rev. Palmer testified that he had been concerned about his small daughter who lay on the back seat in a cast, and that he was not looking directly to the front, but that an instant or so before the impact he got an impression of a shadow on the road ahead and then the next instant realized it was an object parked on the road. He too was sure that the object was still and *327 that there were no lights on the rear of it. Warren Smith, the driver .of. a Herrin Transportation truck, passed the two trucks just north of Longville about 8:30 or -8:45. His testimony was that he did not see any taillight or any other light on the back of the trailer and that he almost collided with the rear of the trailer himself. According to Gordon Ross, the State Trooper who came to the scene, he found no lights on the trailer aside from one clearance light on top of the left fender.
Andrew Loftin, • who lived seven miles north of Longville and was employed by the police jury, testified that he had occasion to pass through Longville on the night of the accident on his way to a saw mill below Longville to see about getting some lumber delivered next morning to a bridge that had broken down that day. His wife was in his car with him. Sometime after 7:00 P.M., however not being positive of the time, they stopped in front of a small store in Longville and Mr. Loft-in walked into the store to get a paper, as he frequently did. At this time, according to Loftin, the two trucks that were later involved in the accident were stopped in front of the store and two men were working on something under the hood of the front truck, the International. To get into the store he walked directly behind the trailer attached to the second truck, and he testified that he did not see any reflector or taillight on it. He testified further that he heard one of the men say, “Now, try it,” and that the other one replied, “Maybe we can get on” or something to that effect; that the truck lights were turned on before he drove off and that the lights were as dim as the dimmers on his car. After he had accomplished his mission, and he and his wife had visited a short while with a relative, they started home and came upon the scene of the accident where they recognized the same trucks that had been stopped in Longville. His wife, who had sat in their car as Loftin walked into the store, corroborated his testimony as to what had transpired in Longville.
All of this testimony has been reviewed here in some detail because of the great volume of testimony in the record and because of the wide variance on some essential points between the testimony offered by plaintiffs and that offered by defendants. 'The testimony given by Mr. and Mrs. Loftin and by Warren Smith, three disinterested witnesses, is impressive because of its.clearness and directness. After carefully considering all of the conflicting evidence it is our conclusion that both trucks were stopped prior to the collision and that there had been ample time for flares to have been, put out, but this was not done; further, that there was no taillight burning on the trailer, and that these trucks, particularly the Chevrolet truck and trailer, were not adequately equipped with rear lights even at the beginning of their trip. Paragraph 5, Subsection (g), of Section 9 of Act No. 286 of 1938, LSA-RS 32:294, requires that vehicles with a length exceeding fifteen feet •■shall carry two clearance lamps on the left' side, ores located at the front and one at the rear, which shall display to the rear a red light visible under normal conditions for 500 feet. In this, and in other matters pointed out above, the defendants were negligent. It seems appropriate to point out here that .there are times when even a strict compliance with the letter of the law with reference to safety measures is not adequate. Certainly the heavy equipment involved here should have been well lighted before it was placed on the highway; but instead, even the minimum requirements of the law were not met.
The. next question for decision is whether Jones was guilty of contributory negligence. We do not feel that it is necessarily negligence to drive a new car that has good lights, good tires and good brakes along a straight paved highway at night at the speed of fifty miles an- hour just because a light rain is falling and the road has slight hills in it. However, the evidence is convincing that the headlights were burning on at least one of the stopped vehicles and this must have created some glow or reflection that could have been seen through the mist. Other drivers that night saw these trucks in time to avoid them. When atmospheric conditions are bad the duty incumbent on a driver to maintain a *328 sharp lookout ahead becomes even stronger than when conditions are normal; and if he sees the slightest evidence to indicate that there is danger ahead he should slow down immediately, and begin to prepare for what might come. We are convinced that Rev. Jones was not maintaining a sharp lookout just prior to this accident and his negligence in this respect was a contributing cause of the accident that bars his recovery. This also disposes of the intervention by Motors Insurance Corporation.
Defendants have not urged here the defense to the Palmer suit that was set out in their answer, to-wit, that Jones’ negligence should be imputed to Palmer because of a joint venture or agency relationship. We assume that that position has been abandoned. At any rate we feel, as the trial judge apparently did, that the evidence clearly shows that there was not here either a joint venture or an agency relationship.
Defendants strongly urge, however, that Rev. Palmer was guilty of independent negligence that should bar his recovery. In support of this position they rely mainly on Clifton v. Dean, La.App. First Cir., 1936, 169 So. 788, and Lorance v. Smith, 173 La. 883, 138 So. 871. In the Clifton case there were three persons riding on the seat of a heavily loaded truck which had, instead of the regular glass windshield, an improvised windshield made of cardboard with a hole about 4 by 6 inches cut in it to provide vision for the driver; the accident occurred on a rainy night. Those facts were so different from the present facts that what was said there about independent negligence of the passenger 'would not be applicable here. In the Lorance case four persons were riding on the seat of a coupe which was driven by a young boy who, in a “show-off” spirit, was driving fast and zigzagging down the highway. Again, that decision is not pertinent here-
 Palmer was obviously concerned about the comfort of his small daughter on the back seat who had just been released from the hospital and whose body was almost completely encased in a cast. It is not surprising that he rode off and on during the trip with his back toward the right door so that he could easily look at or speak to the child on the back. While it is true that a guest cannot lightly abandon all care and throw all precaution to the wind, yet the facts here are that Jones was a more experienced driver than Palmer, and there was no reason for the guest to attempt to superimpose his judgment over that of Jones; in fact, to do this might have been negligence itself. There is- no evidence present here to indicate that at any time on the trip Jones had been guilty of any apparent recklessness; there was nothing in the circumstances or in the actions of the driver to make Palmer dubious in any degree as to his safety. There had been no material change in the driving or geographical conditions since the parties passed Opelousas, except that on this last lap of the trip they were travelling on a straight road whereas previously the road had been otherwise.
There is no ground for finding Palmer guilty of independent negligence, and the judgment in his favor should be affirmed, after making the changes in quantum that are pointed out hereinafter.
Rev. Palmer received serious and very painful injuries. He was knocked unconscious and didn’t regain consciousness until after he had been carried to Frazar’s Clinic in DeRidder. The force of the impact drove a screw driver through the door of the glove compartment and into his right knee. An X-ray examination made on April 17, 19S0 by Dr. Stakely Hatchette, of Lake Charles, showed a large chip fracture in which a big fragment was broken away from the lip of the acetabulum which had been displaced upward and healed above and to the side of its normal location. There was ánother fracture between the ischium or lower part of the hip bone and the descending ramus or branch of the pubis; here the bones healed in fairly good position. X-rays of the right knee showed a roughening of the cortex of the bone. He remained in the hospital for about a month, and ■ was taking diathermy treatments regularly up to the time of the trial in October, 19S0, or for one year. Dr. *329 Frazar, testifying at the .trial, stated that Palmer had traumatic arthritis resulting from the injuries, and that his permanent disability was estimated at between 30 and 50 per cent. He has suffered pain continually, both day and night. A major operation to reset the hip was recommended, which would cost $1,500.00, and at the time of the trial Palmer had given up his church work, which he had resumed on a limited scale, and was getting ready for the operation. According to Dr. Frazar this operation should relieve some of the suffering but would probably not relieve the permanent disability; but without this operation the testimony was that he would get to where he could not walk at all. ■ The lower court allowed Palmer $1,000.00 for his pain and suffering; we think this should be increased to $2,500.00 and that the award for medical expenses should be increased -by $1,500.00 to provide for the necessary operation. The amount arrived at by the trial court for loss of earnings is admitted by defendants in their brief to be correct and will not be disturbed. These changes bring the total award to $10,363.-00, and we think, in view of the decreased value of the dollar, this is a proper award.
As amended, the judgment in favor of Palmer will be affirmed by a separate decree.
For these reasons, the judgment in the case of George J. Jones v. David H. Burke, et-als. is affirmed.